The next two cases, United States v. Lopez Payen and Garcia v. Chilcote are submitted on the briefs. We'll hear the next case for argument, which is Coleman v. Pliler. Good morning, Your Honors. May it please the Court, I'm Allison Clare, Assistant Federal Defender on behalf of the petitioner Mr. Coleman. I'm going to try to reserve five minutes for rebuttal, and I'd like to begin with the ineffective assistance of counsel claim. The fundamental issue here is the reasonableness of counsel's reliance on a psychiatric investigation that was conducted in 1978 and 79 for purposes of a 1986 trial in a case that counsel knew presented the possibility of PTSD, and when both scientific and legal knowledge of that field had blossomed in the intervening seven years. The Supreme Court last term in Wiggins. You know what he had, there were I think nine psychiatric experts overall who looked at Coleman, and not a single one of them suggested that post-traumatic stress syndrome was implicated. There were some noises made in testimony at trials that maybe it was a little Vietnam-related, but nobody actually said anything which would have caused counsel to follow up. I have two responses to that, Judge Reimer. The first is that all of this was always an insanity and diminished capacity case, and so there was a tremendous amount of psychiatric workup. But all of those opinions that did not diagnose PTSD preceded significant developments in the field. Well, I think one of them was Dr. Axelrod, who testified prior to the time of this trial in another case about the syndrome. So he certainly was right on top of it, and he interviewed this guy and never said boo about it. He did, in fact, in this case write about the connections between Mr. Coleman's mental illness and his Vietnam experience. We have to remember that during the 1978 and 79 evaluations, the diagnostic criteria for PTSD were still in flux. They were being field tested. Dr. Williams, our expert, whose declaration is at tab 6W, was in the process of testing those in the field at the time. And certainly some of the experts who interviewed Mr. Coleman were aware that this new diagnosis was in the process of being finalized. But it had not been finalized. And the bibliography, which I think it's in the form of a footnote to the brief and numerous excerpts, but there was a tremendous amount of psychological and psychiatric literature that post-dated the first trial. But if the two doesn't fit, it doesn't fit. That's the problem. In 1978 and 1979, most of the experts in the field had not yet recognized, and Dr. Williams and Mr. Larson addressed this point specifically in their declarations, the extent to which the Vietnam experience was different than other forms of combat trauma that had been known by different names and had different screening criteria, such as shell shock from World War I and combat fatigue from Korea. The differences in those psychiatric problems are related to differences in the war. And in the early 80s, a tremendous amount of work was done talking about how you identify the particular trauma that was experienced in Vietnam, the work that needs to be done determining the facts of the combat operations, what was seen by the defendant, how you investigate that, no longer simply relying on a clinical interview, but doing historical research into the combat experiences, and then tailoring interviews, both of the defendant and family members, in light of that information. That work was never done because it was not part of the protocol in 1978 and 79, as Dr. Williams has explained. It was part of the protocol by 1984. When the trial counsel attended... That's why I'm so odd to me, because Dr. Axelrod testified about it in 1982, and he was one of the people who interviewed him. He interviewed Mr. Coleman in 1978. Well, I know, but he was on the page, you know. I mean, look, let me put this thing differently. It seems to me that Hendricks, our case in Hendricks, is just practically right on. That is that, you know, the lawyer isn't a psychiatrist, obviously, and so his obligation is simply to touch base with people who are experts in the field. And if they don't point him in the direction, well, he's not ineffective. I think that the cases that are more on point to the reasonableness analysis here are the Supreme Court's decision in Wiggins and this Court's decision in Caro, and I'll explain why. But first I want to address a point in Hendricks that I think is relevant, because I want to acknowledge up front that both Wiggins and Caro were penalty phase reasonableness assessments, and Hendricks mentions the distinction between Strickland analysis in a penalty phase mitigation context and a guilt phase. But I think it's important to emphasize the Strickland standards themselves, particularly the one at issue at Wiggins and here, which is, is an early decision by counsel to pursue one line of defense and not investigate another, is that decision at the time it is made supported by sufficient investigation to be a reasonable informed choice. That question and the familiar Strickland standards for answering that question are the same for guilt phase, for sanity in this case, and for penalty phase. The outcome of that analysis, when we're talking about the failure to develop certain evidence, will obviously depend on the admissibility of the evidence, its relevance and its probative value, given the legal question. Is it the elements of defense? Is it sanity? Is it mitigation? And so we do have cases, and Hendricks is a good example, where certain evidence was found not to have been unreasonably ignored as to guilt phase because it would not have made a significant difference to the guilt phase analysis. But, yes, it would have been helpful for mitigation. In the Wiggins case, wasn't it a tactical decision not to investigate further? We don't have that here. Well, we have a post hoc rationalization here, which is what we had in Wiggins. Mr. Gable has stated in his deposition and affidavit that he decided not to pursue PTSD because he didn't think there was a basis for it. And our point is that he did not do what he needed to do in order to make that decision, which was to contact the psychologist and or the intern at San Quentin, who he knew believed that the offense was PTSD related, and find out why they thought so. He did not contact any of the specialists that he acknowledged in his deposition he knew existed to ask them, okay, how has the field changed since 1978? What do I need to do to rule this in or out? He did not hire a consultant who had that expertise. In Wiggins, the Supreme Court found that counsel, like here, who had done something, they had some records. This is not a case in which counsel completely failed to consider a mental health defense, because it was always a sanity case. And in Wiggins, the Supreme Court said first that counsel's decision not to go further was unreasonable because it fell short of the prevailing professional standards of practice in Maryland at that time for development of a mitigation case, which included doing a comprehensive social history. And to that extent, I believe it actually calls part of Hendricks, which is not at issue here, into question, because Hendricks also held that it wasn't necessary to do a social history and that that wasn't relevant to the Strickland analysis. In any case, here we're not talking about the standards of practice for capital mitigation social history work. We're talking about the standards of practice in 1985 and 86 for investigating a PTSD defense. And we have a very thorough explanation of those standards in Mr. Larson's declaration and Dr. Williams' declaration. And Mr. Gable testified in his deposition and affidavit, excuse me, that he had attended a training seminar on PTSD in 1984. So he would have been aware of the changes in the field that had taken place. He would have been aware of the need asserted in all of those articles cited and by our experts to consult someone who knew how to do a specific type of investigation. He failed to do that. Also in Wiggins, the Supreme Court said that it was unreasonable not to do further investigation of the child abuse in the defendant's history in light of certain information that was in records counsel possessed, which mentioned an unstable home life and various other unhappy childhood factors. Similarly, in this case, Mr. Gable stated that he was aware of the chrono that was written by the psychology intern saying that the offense was typical of PTSD. And the psychologist had signed off and said, I agree. He did not contact either of those people prior to trial. Although he says that he investigated whether there was a reason to go further with PTSD, he didn't ask the people that he knew thought there was. I also want to point out that another important factor in the context of this decision is what Mr. Gable knew when. He has, and Respondent has in these proceedings, attempted to justify the decision not to pursue PTSD. And this was the magistrate judge's reasoning. That it was. That's what I wanted to ask you. Thank you. Would you tell us what exactly? Had an evidentiary, or she or whoever. Well, the evidentiary hearing actually was on a question separate from the basis of the magistrate judge's. The name of an expert. Right. And I'll return to that point in a minute. But first I want to tackle head-on the magistrate judge's basis for his recommendation. He says that it was reasonable of counsel to forego the PTSD defense because neither Dr. Galeani, the expert who did testify, nor Dr. Gilbert, his consultant, believed that Mr. Coleman suffered from PTSD. That is not the question. Under Wiggins, the question is, did counsel have a reasonable basis for failing to pursue PTSD? We know that Galeani believed that Mr. Coleman suffered from paranoia. But when he was retained by Mr. Gable, he updated his paranoia diagnosis under the new criterion. But he states very clearly in his affidavit that what he did to prepare for the 1986 trial was review the 1978 and 79 psychological reports. He did no further clinical evaluation. He did no review of the PTSD literature. He did not consult any experts. And significantly, he testified on cross-examination at the trial that he had not been asked by defense counsel to consider PTSD. So respondent cannot now rely on Dr. Galeani's opinion, which he did develop at some point during, you know, this case. Neither Galeani nor Gable, in Gable's deposition or either affidavit, can specify that they had a pretrial conversation at the investigation stage about whether it was worth pursuing PTSD. Gable even said it may have been during the trial that they talked about PTSD for the first time. He couldn't remember. But he was not retained for that purpose, and he did not, although he did, you know, come to believe that PTSD was not an issue, he did not screen for it, he was not asked to eliminate it. Similarly, Dr. Gilbert, who is not by any means an expert in PTSD in particular, did not perform any clinical evaluation of Mr. Coleman. She was not asked to diagnose him. Her role, if you read her affidavit, which is exhibit X to the answer, which is part of your appellee's excerpts, she states that she was hired to do a records review. And if you look at her billing statements, they're attached to the affidavit. The billing statements show that she read the 1979 trial transcripts and all of the previous psych reports. She contacted the people who had done the 1978 reports, but no PTSD experts. And there was no literature review before the magistrate judge. Yes, it was. Well, can you just tell me, the magistrate judge has quite a well-detailed decision here, the findings and recommendations. The magistrate judge had a evidentiary hearing with respect to the contention that the petitioner had actually told his counsel that he had PTSD. The magistrate judge that says that the defense, I think it's a 1986 trial, called Dr. Markham to testify, and he testified. Dr. Galliani, excuse me. Judge Schroeder. Well, that was the first trial. Galliani, yeah. He was appointed at the first trial, and Galliani did state that there were incidents. But what is wrong? I mean, it describes the evidence, and it rejects the contentions that there should have been more done as a matter of effective counsel to put on a defense of stress disorder. Well, but where is it wrong? You're making a good argument. In other words, you're making a good argument to the magistrate judge, but I'm not. All of these arguments were made to the magistrate judge. Because we do not have page limits in front of the magistrate judge. Believe me, both sides submitted volumes of argument in this case. We've been litigating this case for years. And I do not understand why the facts that I consider to be dispositive are not addressed in the findings and recommendations. But perhaps the magistrate judge was dispositive. Because we objected, and I did cite Wiggins in the objections. Part of what I think is wrong with the findings and objections is that they are inconsistent with Wiggins. Because Wiggins reminds us again that what we have to analyze, because this is about the decision not to investigate PTSD and not to develop that evidence, is what Mr. Gable knew when he chose to go with the old paranoia defense, which had already failed once, and not to explore and develop further evidence that might support PTSD to see if that was good. If he had done that kind of ‑‑ if he had called an expert, just as a consultant, and said, here are the previous psych reports. They mention Vietnam, but they don't diagnose PTSD. A lot has happened since then. What do you think? Do I need to do anything else before I decide this can't go anywhere? My gut says it doesn't go anywhere. That would be one thing. He talked to family members. He talked to friends. He talked to his client. He asked all the right questions. He had in his head the Vietnam problem because he had gone to the seminar, as you say. He tried to touch all those bases, and he produced nothing. And so ‑‑ and there's still nothing. I mean, you know, you look at the record, and it's just words. There's still nothing to show that had he pursued anything, it would have come up roses. Well, I think that the declarations of Mr. Larson and Dr. Williams, which we would, you know, represent would be what could have been presented at the trial, raises significant doubt as to intent that is not raised by a paranoia defense. When were those declarations? 1992, I believe. And the point that I wanted to make about the paranoia defense, again, just as a matter of context, what counsel was choosing was highly risky because, I mean, there are always risks involved, and that's what counsel's job is, to weigh the risks and benefits. He can only do that if he knows the risks and benefits of both. But, you see, what you're asking us to do is to hold that counsel in 1986 should have raised a defense that was not available in the testimony of any of the experts that he talked to, and he did, and he, according to the record here, he went to a lot of people, and he had the base, he had lots of information from the prior trial as well, that he should have mounted a defense based upon what was learned seven or eight years later. And that seems, what's troubling me, at least, is that you seem to want a holding that we should look to what was available eight years afterwards in order to determine the standard that should have been met by counsel at the time of trial. That troubles me. Why is that not what you're arguing? Because I'm arguing that the later developed materials that we worked up go to prejudice. When we're talking about reasonableness, which is where I am disagreeing with the magistrate judge, what counsel had in front of him in 1985 and 1986 included the reports of experts discussing Vietnam but not talking about PTSD and a record in the prison file saying this offense is typical of veterans who suffer from PTSD. He did not make a single phone call to find out what does that mean, what do I need to do about it. He knew in 1985 that there were specialists in this field and there had been developments in this field. He did not contact them. He hired a consultant who says in her affidavit, which is quoted in Apolli's brief, that part of her job was to look at any developments in the field of psychology that might be relevant. Her billing records show her only literature review involved dioxins, meaning Agent Orange exposure. No literature review around PTSD. No consultation with anybody who specializes in PTSD. Oh, which is a 20-minute phone call. But his client said that he thought he had exposure to Agent Orange. I'm not saying that it was incorrect. The magistrate judge had a hearing to determine whether or not the client had told the lawyer that he had PTSD. Two different points in response to that. First, for Judge Reimer's point, I'm not faulting counsel for exploring another potential avenue and ruling that out. That's not at issue here. The point is that as to the reasonableness of the decision to forego a PTSD investigation, there was no review of the literature since the last trial until the new trial to see what else might be necessary, and that was in the order of appointment for the consultant. This was an insufficient basis on which to make a reasonable and important decision to forego that. See, the thing is, I guess my problem, and that's why I come back to Hendricks, the consultant may have screwed up, but the lawyer is entitled to rely on a consultant. The lawyer is also, and this is where Caro v. Calderon comes in, the lawyer is responsible for determining if a particular type of specialist is necessary under certain circumstances, and I would argue that this case presents such circumstances. All right. You've just about used your time.  Thank you. Good morning, Your Honors. Janine Bush for a respondent and appellee. One minor housekeeping matter. When I submitted my appellee's brief on June 26th, I also submitted a volume of excerpts of record, but I also sent to the Court the entire lodged trial transcripts. Those constitute two boxes, like boxes that would hold copier paper, and each volume of transcript has a notice of lodging on it, and it's in this fashion. However, in talking to the clerk, I'm not sure that you guys actually received it, and so I would invite the Court perhaps to check the records to see if that's there. Two big copier boxes. If there's a difficulty in finding it, it's perhaps because, and I'm just guessing, the Secretary might have put the lower court number as opposed to the Ninth Circuit number. You tried to find them? Pardon me? You tried to find them? Well, I asked the clerk of the Court to see if they were recorded in any fashion on their docketing materials to show their receipt. They will look at them. Yeah. And so that's available to the Court, and it's been there. And my guess would be it might be in a records room. We'll go in a period of time. Okay. And I feel that it's important to the Court because all of the testimonies of all of the doctors from the first trial are in there, the various psychiatric consultants, and also in the second trial, the whole voir dire and argument on the jury misconduct issue. We are aware of it. Yes. Okay. Yes. And so I do wish the Court to have that. A quick comment on the ineffective assistance of counsel contention concerning the investigation and presentation of post-traumatic stress syndrome as a defense. I'm most interested in your comments on what the Wiggins case means in this. Your Honor, the Ninth Circuit itself has filed a post-Wiggins case on November 26th, which I found last night. It's Brodit v. Canberra. It's ---- Have you given it to opposing counsel? No. I just found this last night as I was doing final checks. You need to give it to all of us this morning. Yes. I can send ---- I can photocopy and send it to you. Just leave another gum sheet with the clerk. I have the ---- Leave the site. Okay. And the sheets that the clerk has. There's no site. Just the slip of opinion number. That's fine. Okay. Just the slip of opinion number, the name of the case, the slip of opinion number and the date. Yes. The name is, again? Brodit, B-R-O-D-I-T, v. Canberra, C-A-M-B-R-A. Of course, it's not final yet either. It was literally just filed practically yesterday. So anyway, one of the things to keep in mind in any kind of Strickland analysis, the lodestone of a Strickland analysis, is to look at the facts as developed and before the attorney at the time he's making decisions about what to do. And in this particular case, we have a defendant whose statements at the time of the crime and whose testimony at the first trial absolutely precludes the argument that, oh, I murdered while under the influence of a flashback to a combat experience. We have him saying, I don't have to take this shit anymore. We have him shooting his wife, then going upstairs, overturning a bed, looking at the children and saying, I'm sorry I have to do this to you. There's no way. When he spoke at the first trial, there was nothing that he testified to that indicated he was under the influence or experience of some kind of flashback. It doesn't sound particularly rational. Well, angry things often aren't, you know. But how does that have anything to do with PTSD? At the time, as was just explained, not much was known. But the 85-86 trial, if you look at Wiggins, they say, was there a reasonable basis for the lawyer's failure to pursue an investigation, particularly I would think dealing with the prison trial would suggest in 1985 PTSD. That Cathy O'Meara psychological intern note, which was not part of Ellicoffer's own notes, but Gable did see it, simply says that his symptoms are characteristic of somebody with post-traumatic stress disorder. It doesn't analyze the crime. It doesn't fit it to the facts of the crime. And when you do that, it doesn't fit. Was it reasonable for the lawyer? I mean, the lawyer did a whole lot of things and had a whole lot of experts and so forth. But at that time, was it reasonable under Wiggins for him to fail to pursue that particular line of inquiry? Your Honor, he pursued the line of inquiry he pursued was to determine what, if any, of prior mental defenses would be still valid and if there is anything new. Now, he knew what it was to present a case saying a crime was causally linked, mental state, to post-traumatic stress disorder because he had gone to that seminar. And he could then turn around and look at the facts of his own case and go, that is not going to fly because if I get an expert up there trying to say that this crime occurred under the influence of a flashback from Vietnam, I'm going to get the defendant's admission shoved right down my throat. It would be so ugly. There's no way it was even remotely practicable to try to present that kind of a defense. And he has to look at the facts of it. He can't change those facts. I mean, no consulting of experts on what medical standards are going to change the facts of what the defendant did at the time. You describe what he said at the time. That, to me, doesn't rule out PTSD. You seem to think it's obvious. My problem is this. A person can be suffering from post-traumatic stress disorder, and indeed that disorder not be causal in the crime committed. So it is possible. I'm not saying it's the case, but it's possible. He has post-traumatic stress disorder in some fashion or another, but that is not what caused him to kill. We have his own statements at the time. We have Kimberly's statements of what he said at the time. He was not under the influence of a Vietnam flashback when he shot these people. So you can't shove the facts of the murderer into some general diagnosis of post-traumatic stress disorder, of the murderers, I should say. So that's the primary problem with that kind of approach in this particular case. I also wanted to address the jury misconduct issue before the court, and I wanted to sort of clarify the analysis a little bit. When the trial court had brought to its attention before the sanity phase of the case started that these two articles had just appeared in the paper, he basically got all the jurors in front of him and asked lots and lots of detailed questions. That is a going-forward decision. In other words, it's almost like a jury panel disqualification for bias kind of inquiry. I now have these jurors. I have to determine if they are competent to sit further on this case for this new issue to be adjudicated. And that clearly is a demeanor question. It's a trial court weighing of the responses kind of question under Patton v. Yount. And then the second part of the trial court's inquiry was generated by the trial court saying, okay, I believe the jurors. I think this had minimal effect. I don't think this has anything to do with the issues that are going to be tried. But you know what? I want to hear the entire sanity phase all, you know, one day of it. And I want to reserve the ability to have a new trial if I think that in turn the way the evidence came out, there's just no way that this would have worked to be a situation where the jurors wouldn't have been influenced or biased in some fashion. So that's kind of the afterward inquiry. And that was brought procedurally by way of a motion for a new trial. It appears the counsel is arguing that that is a question that's committed to de novo review. And that's simply not the case. In Mancuso v. Olivares, which is counsel's own case, the court says quite clearly that there's special deference accorded to the trial judge's impression of the impact of the information upon the jury. That's squarely what's occurring here. The trial court is now looking at the evidence that came in at the insanity phase and saying, how could this possibly have impacted, despite the jurors' assurances, despite their good faith? And it's significant, I think, that both doctors who testified, Dr. Gaglione and Dr. French, were asked the question by both Prosecutor Mr. Drewliner and the defense attorney, Mr. Gable. You knew, this is the prosecutor asking, you knew that the defendant had on a prior occasion threatened to kill his wife. Did that fact figure in your opinion about whether or not the defendant was insane at the time he committed these murders? Both of those psychiatrists said that had absolutely nothing to do with the inquiry. It isn't even relevant to our determination of what he was thinking at the time that he killed these people. And I should give you RT sites for that, since I'm not sure that you've got the transcript. Anyway, Dr. French is at the second trial, RT 5485. And Dr. Gaglione's discussion in response to that question is at RT 5446 to 5448. So I'd like to direct the court to that. And unless the court has further questions? No. Okay. Thank you very much. I know I used up more of my time than I intended, but I want to just rebut one point made about IAC and then address the jury misconduct. Counsel emphasized causal relationship between the offense and PTSD. That would only be relevant at sanity phase, when the defense has a burden. We've argued that this was unreasonable and prejudicial also at the guilt phase, when the issue is whether the prosecution has proved intent beyond a reasonable doubt. And all of the issues about the defendant's own statements about the offense and their compatibility or not with a PTSD diagnosis are addressed by our experts. I refer you to those declarations at tabs 6D and W, because that's adequately addressed. On the jury misconduct claim, I pointed out in the reply brief that, A, it's not a Patton v. Yount problem. Extrinsic evidence is assessed on external factors that this Court has laid out. They're all in the briefs. But I want to say the most important of those extrinsic factors in this case is the fact that so many jurors themselves misremembered the extrinsic evidence that they had heard in a way that made it even worse for the defendant. They didn't remember that Shirley had written letters making accusations. They remembered that Mr. Coleman had directly written threatening letters, which was not true. Finally, very important point, the magistrate judge makes a misstatement of the record on this issue that is inconsistent with what's before you and what Respondent has correctly argued. The magistrate judge states that this extrinsic evidence was cumulative because the experts had testified about Shirley's letters. They testified about Shirley's letters in the 1979 trial, and that's why that was reversed. The only evidence, and the California Court of Appeal and Respondent emphasized, was only the evidence of one incident with the gun. You do have that transcript in my supplemental excerpts. And Dr. Galliani made it very clear that incident did not indicate any longstanding plan or pattern of threats toward the family, no prior evidence of threats against the children. Thank you. The case just argued is submitted for decision. We'll hear the next case for argument, United States v. Harwood.
judges: Schroeder, D.W. Nelson, Rymer